IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

|  |  |
|---|---|
| KIMBERLY HOLLANDSWORTH,<br><br>      Plaintiff,<br><br>    v.<br><br>CITY AND COUNTY OF HONOLULU;<br>LIANNE WOLFRAM; JOSEPH C.K.<br>LUM; JOHN AND/OR JANE DOES<br>1-10,<br><br>      Defendants. | Civ. No. 19-00587 ACK-WRP |

## ORDER DENYING DEFENDANT LUM'S MOTION FOR SUMMARY JUDGMENT (ECF No. 51)

For the reasons discussed below, the Court DENIES Defendant Lum's motion for summary judgment, ECF No. 51.

## BACKGROUND

The following facts are repeated from the Court's prior orders, ECF No. 18 and 29, and are supplemented by the parties' concise statements of fact ("CSFs"), ECF No. 52, 60, and 64.

### I.   Factual Background

This case relates to a dispute over the ownership of a horse named "Jasper."  ECF No. 1 ("Compl.") ¶ 13.  Plaintiff Kimberly Hollandsworth and Defendant Lianne Wolfram have separate and distinct accounts of the events that transpired.

**a. Wolfram and Defendant Lum's Version of Events**

On September 28, 2017, Defendant Lianne Wolfram, a Honolulu Police Department ("HPD") officer, told Plaintiff Kimberly Hollandsworth that she was looking for "someone to do a long term full lease" of Jasper.  Def. Ex. 2; see also Wolfram Decl. ¶ 7.  Wolfram explained that she was "[n]ot getting rid of him" and that Jasper was "not for sale."  Def. Ex. 2.  Wolfram communicated to Plaintiff that Jasper:

> would come with a contract. Signed by both of us and witnessed by professionals we trust stating that I cannot come take him at my whim.  He would be YOURS legally without a sale agreement.  This just protects me in any case of neglect where I would have to prove that immediate removal of the horse was necessary due to any type of gross neglect.

Id.  Wolfram further expressed to Plaintiff that "the contract would state that if I choose to relinquish ownership you would have first right of ownership at no cost."  Id.

On September 30, 2017, Plaintiff agreed to take Jasper pursuant to the terms of a "Free Lease Agreement."  Wolfram Decl. ¶ 12.  While verbally discussing the terms of the Free Lease Agreement, Plaintiff requested to take Jasper for a two-week trial period.  Id. ¶ 13.  The parties agreed to meet on October 4, 2017 to begin the trial period.  Id. ¶ 15.

Around this time, Plaintiff asked one of her friends-Visakha Gibbons-for help trailering Jasper from the Helemano Plantation to the Ho'ala Ranch.  Gibbons Decl. ¶¶ 2, 3.

2

Plaintiff told Gibbons that Jasper belonged to Wolfram, and that she was not purchasing Jasper.  <u>Id.</u> ¶¶ 3, 4.  Plaintiff explained to Gibbons that the property where Wolfram kept Jasper was being sold and that Wolfram had offered to lease Jasper to her.  <u>Id.</u> ¶ 4.

On October 4, 2017, Plaintiff and Sakata transferred Jasper to Ho'ala Ranch.  Wolfram Decl. ¶ 18.  Upon arrival, Wolfram provided Plaintiff with a physical copy of the Free Lease Agreement.  <u>Id.</u>  Plaintiff said that she would finish reading the agreement and propose any changes prior to the end of her two-week trial period.  <u>Id.</u> ¶ 19.  As the end of the trial period neared, Wolfram gave Plaintiff an additional one-week trial period following the initial two-week period because of Wolfram's personal travel plans.  <u>Id.</u> ¶ 20.

On October 26, 2017, Plaintiff communicated to Wolfram that she did not think Ho'ala Ranch was safe for Jasper so she had moved him.  <u>Id.</u> ¶ 22.  Wolfram went to see Jasper and observed that he was sharing a pen with another horse, that the area was not free of debris, that it did not provide any shelter, and that the metal fencing had many sharp ends.  <u>Id.</u> ¶ 24.  Wolfram also noticed that Jasper's rear leg appeared to be injured.  <u>Id.</u> ¶ 26.  After Wolfram expressed her concerns to Plaintiff, Plaintiff asked Wolfram if she would like Jasper back.  <u>Id.</u> ¶ 25.

Troy Sakata, Plaintiff's boyfriend, overheard the conversation between Wolfram and Plaintiff.  Id. ¶ 29.  After Plaintiff had left, Sakata walked toward Wolfram, placed his face within inches of Wolfram's, and said "So what haole?  This not good enough for you?  Take him back then.  Take him right now.  I don't want your damn horse."  Id. ¶ 30.  Sakata then headbutted Wolfram, and shouted "This is Waimanolo.  I'm from here.  I know everyone here.  I have boys that can make you disappear and no one will ever find you.  You have no idea what I could do it you.  And don't think because you're a cop that's going to matter.  So you better get your horse now and leave." Id.  Wolfram then left the property.  Id. ¶ 31.

The next day, Plaintiff messaged Wolfram to ask if some of the agreement could be "re word[ed]."  Def. Ex. 2.  When Wolfram didn't respond, Plaintiff then told Wolfram on the morning of October 28, 2017, that she had "thought about it and the agreement ha[d] changed so you can pick him up today."  Id.

That same day, Wolfram contacted Defendant Lum through Facebook Messenger and told him she needed stand-by assistance in order to take back a horse that she had leased to Plaintiff. See Pl. Ex. A.  She felt she needed backup because Plaintiff had communicated with an attorney, Sakata had headbutted and threatened her two days earlier, and because Plaintiff's messages "which indicated that she intended to deprive [Wolfram]

4

of [her] property." See Wolfram Decl. ¶¶ 37, 39. Defendant Lum responded by agreeing to assist her and telling her to bring documentation with her. See Pl. Ex. A. Later that afternoon, Wolfram called the Kailua Police Station requesting a HPD "stand-by." Wolfram Decl. ¶ 39. The Kailua Police Station relayed the call to Defendant Lum and one other HPD officer, both of whom met Wolfram at the stables. Lum Decl. ¶¶ 3, 4; Pl. Ex. A.

When Defendant Lum arrived at the Waimanolo Polo Fields, he reviewed Wolfram's proof-of-ownership paperwork, including a veterinary patient chart listing Wolfram as the client, the Free Lease Agreement for Jasper, and several text messages between Wolfram and Plaintiff. Lum Decl. ¶ 5. Wolfram explained to Defendant Lum that she had given Plaintiff the Free Lease Agreement to review, but that it was not finalized. Id. ¶ 7. Wolfram told Defendant Lum that Plaintiff had not liked the Free Lease Agreement's terms and that because they could not agree on the terms, Wolfram wanted Jasper returned. Id.

Wolfram also walked Defendant Lum around the stables and pointed out to him Jasper's injury as well as conditions that she believed were dangerous to the horse. Wolfram Decl. ¶ 42; Pl. Ex A. Defendant Lum also observed that Jasper appeared to be injured because he could not put any pressure on his rear leg. Lum Decl. ¶ 6.

When Plaintiff and Sakata arrived at the scene, an argument ensued.  Id. ¶ 8.  Defendant Lum asserted that he was in charge and asked Plaintiff whether she could provide any documentation of ownership.  Id. ¶¶ 9, 10.  In response, Plaintiff showed Defendant Lum her copy of the Free Lease Agreement and told him she also had text messages but did not show him any of those messages.  Id. ¶ 10.  Plaintiff told Defendant Lum that Wolfram had gifted Jasper to her, but also that she did not agree with the terms of the Free Lease Agreement.  Id. ¶¶ 10, 11.

Around this time, the veterinarian who Wolfram had summoned to look at Jasper's injury arrived to attend to Jasper. Wolfram Decl. ¶ 47.  After Dr. Himenes stated he would need access to the paddock area to treat Jasper, Defendant Lum requested that Plaintiff remove the chains.  Id. ¶ 48.  When Plaintiff refused, Dr. Himenes stated, "[w]ell the horse needs to come out of there one way or another.  There's no shelter and he must be treated.  If you won't unlock the gate, I'll request the fire department to come and cut the locks."  Id.  At this point, Sakata told Plaintiff "just give her back the horse." Lum Decl. ¶ 12; see also Wolfram Decl. ¶ 49.

After Plaintiff allowed Dr. Himenes to access the paddock, Dr. Himenes gave Jasper an IV and then instructed Wolfram to walk him to start circulation in his leg.  Wolfram

Decl. ¶ 49.  Based on Sakata's statement and Plaintiff's willingness to unlock the gate, Wolfram believed that Plaintiff had conceded that Wolfram could take Jasper back.  Id. ¶ 50. Defendant Lum then stood by as Wolfram loaded Jasper into a trailer.  Lum Decl. ¶ 12.  Defendant Lum claims that he did not threaten or order Plaintiff to give Jasper to Wolfram.  Id. ¶ 13.

Plaintiff completed HPD Form 252 to explain her claim of ownership, Pl. Ex. A, and Defendant Lum referred all parties to the civil courts to resolve any ongoing dispute.  Lum Decl. ¶ 16.

### b. Plaintiff and Sakata's Version of Events

On the other hand, Plaintiff's position is that Jasper "was given to me by Defendant Wolfram to be mine unless and until I became unable or unwilling to adequately care for him." Hollandsworth Decl. ¶ 5.  Plaintiff had no interest in leasing Jasper and she "made that abundantly clear" to Wolfram.  Id. ¶ 14.  Plaintiff also asserts that there was never any trial period.  Id. ¶ 15.

On October 26, 2017, Wolfram visited Jasper and communicated that she was upset that Plaintiff had moved Jasper without consulting her first.  Id. ¶ 16.  Sakata denies swearing, threatening, headbutting, or assaulting Wolfram in any way.  Sakata Decl. ¶¶ 17-20.  Sakata testified that he felt

"threatened and intimidated" by Wolfram that day "because she was a police officer and had a gun." Id. ¶ 21.

Because Wolfram was upset over Jasper's move and adamant about the Free Lease Agreement, Plaintiff offered to return Jasper to her because she had no interest in leasing a horse. Hollandsworth Decl. ¶ 17. Plaintiff then withdrew her offer to return Jasper when Wolfram refused to reimburse her for the costs she had incurred in caring for, treating, and boarding Jasper for the month she had him. Id. ¶ 18. Plaintiff then informed Wolfram that she had communicated with an attorney, and that she would wait to hear from Wolfram's attorney. Id.

On October 28, 2017 when Wolfram came to reclaim Jasper, Plaintiff again expressed her disagreement with a lease, id. ¶ 23, and told Defendant Lum that Jasper had been gifted to her. Id. ¶ 28. Plaintiff tried to show Defendant Lum the messages between her and Wolfram, but he refused to look at them. Id. ¶ 25. Defendant Lum repeatedly announced that he was in charge and that everyone must stop talking and listen. Id. ¶ 27. At this point, Plaintiff felt intimidated by Defendant Lum. See id. ¶ 26 ("I was scared of Defendant Lum because he is physically imposing, was yelling and cussing . . . and threatened to arrest us . . . ."); see also Sakata Decl. ¶ 29 ("I felt bullied and intimidated by Defendant Lum."). However, in her deposition, Plaintiff testified that she did not recall

8

Defendant Lum threatening to arrest her.  See Def. Ex. 5 at 152:14-19.

Plaintiff also states-in contradiction to Defendant Lum's testimony-that Defendant Lum "determined that Defendant Wolfram owned 'Jasper' and would be released to her."  Pl. CSF ¶ 26; see also Sakata Decl. ¶ 31 ("Defendant Lum told Plaintiff that he would decide who was taking the horse.").  Indeed, in his official police report, Defendant Lum wrote that he had "determined that the horse would be released to Wolfram based on the paperwork that I was provided and the inconsistent statements of [] Hollandsworth . . . ."  Pl. Ex. A.[1/]  Defendant Lum asserted that he never expressed his opinion on who was

---

[1/]  Defendant Lum argues that the police report, Pl. Ex. A, is "unauthenticated, hearsay evidence, which is not admissible."  Reply at 4-5. The submissions by a party opposing a motion for summary judgment need not themselves be in a form that is admissible at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

With regard to hearsay, under Rule 801(d)(2), written statements may be admitted as non-hearsay against the party who made the statements.  A police report may be offered as an admission against the officer when the officer who prepared the report is a party.  Quiroz v. City of Los Angeles, No. CV 18-10733-KS, 2019 WL 8013117, at *3 (C.D. Cal. Nov. 19, 2019); Mee v. City of Los Angeles, 100 F.3d 963, at *1 (9th Cir. 1996).  Because Defendant Lum is both a named individual officer defendant and he prepared the police report which recorded his actions and his observations of the incident, the police report is admissible as an opposing party's statement.

On the issue of authentication, Fed. R. Evid. 901(b) provides ten approaches to authentication, including evidence about public records. Defendant Lum's police report bears a Honolulu Police Department header, and a Bates stamp at the bottom.  In fine print at the bottom of each page, the report reads "This report was prepared, signed, reviewed, submitted, and filed electronically via secure network in accord with Honolulu Police Department Policy."  At the hearing, counsel for Plaintiff represented that the report was produced in discovery.  Despite Defendant Lum's conclusory contention to the contrary, at this stage there is no evidence presented that casts doubt on the authenticity or trustworthiness of the police report.  The Court will therefore consider the police report at the summary judgment stage.

entitled to Jasper.  Lum Decl. ¶ 13.  In her deposition, Plaintiff testified that no one told her to give back Jasper. See Def. Ex. 5 at 97:15-20.

Plaintiff unlocked the paddock so that Dr. Himenes could treat Jasper "because [she] no longer felt [she] had a choice."  Hollandsworth Decl. ¶ 30.  Plaintiff was "afraid of Defendant Lum, afraid that [she] would be arrested, and afraid that Troy Sakata would be arrested."  Id. ¶ 31.  Plaintiff contradicted herself in her deposition, stating that she could not recall Defendant Lum threatening to arrest her.  See Def. Ex. 5 at 152: 14-19.

## II.  Procedural Posture

Based on the foregoing, Plaintiff has asserted in her Complaint (1) a Fourth Amendment violation under § 1983 against Defendant Officers Wolfram and Lum (together, the "Officer Defendants") and Doe Defendants; (2) a Fourteenth Amendment violation under § 1983 against the Officer Defendants and Doe Defendants; (3) municipal liability under § 1983 against the City and County of Honolulu (the "City"); (4) intentional infliction of emotional distress against the Officer Defendants; (5) negligence against the Officer Defendants; (6) negligent training, supervision, and/or discipline against the City; and (7) vicarious liability against the City for the Officer Defendants' negligence.  Compl. ¶¶ 54-77.

10

On December 18, 2019, Defendant the City filed a motion to dismiss Plaintiff's Complaint as against the City. ECF No. 11.  The Court granted in part and denied in part the City's motion to dismiss ("Prior City Order").  ECF No. 18.  The Court dismissed all claims against the City and the Doe Defendants, as well as Counts one, two, and five as against the Officer Defendants in their official capacities.  Id.  On March 27, 2020, Defendant Lum also filed a motion to dismiss, ECF No. 21, which the Court granted in part and denied in part ("Prior Lum Order"), ECF No. 29.  The Court dismissed all state-law claims against Defendant Lum, but Plaintiff's Fourth and Fourteenth Amendment claims against Defendant Lum survived.

On July 2, 2021, Defendant Lum filed the present motion for summary judgment, ECF No. 51, and a concise statement of facts in support, ECF No. 52.  Plaintiff filed her Opposition as well as a cross-motion for partial summary judgment, ECF No. 59, and her CSF, ECF No. 60.  Defendant Lum filed a Reply, ECF No. 63, and CSF in support, ECF No. 64.  A hearing was held on October 5, 2021.

**STANDARD**

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Rule 56(a)

mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); see also Broussard v. Univ. of Cal., 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (citing Celotex, 477 U.S. at 323, 106 S. Ct. at 2553); see also Jespersen v. Harrah's Operating Co., 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586–87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (citation and internal quotation marks omitted and emphasis removed); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary

judgment).

 "An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." In re Barboza, 545 F.3d 702, 707 (9th Cir. 2008) (citing Anderson, 477 U.S. at 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party.  Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538; see also Posey v. Lake Pend Oreille Sch. Dist. No. 84, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor" (internal citation and quotation omitted)).

## DISCUSSION

 As an initial matter, the Court dismissed at the hearing Plaintiff's cross-motion for partial summary judgment as untimely.  See ECF No. 69.  Plaintiff filed her Opposition and cross motion for summary judgment on September 14, 2021-which is 74 days after the July 2, 2021 dispositive motions deadline in the controlling scheduling order.  See ECF No. 59.  Because Plaintiff did not request an extension of the deadline and filed

the cross motion without leave from this Court, the Court dismissed it.  See United States ex rel. Int'l Bus. Machi. Corp. v. Hartford Fire Ins. Co., 112 F. Supp. 2d 1023, 1029 n.6 (D. Haw. 2000) ("[C]ounter-motions are still subject to the Rule 16 deadline unless the party has no basis for knowledge of an argument made in the original motion."); B.T. ex rel. Mary T. v. Dep't of Educ., State of Hawaii, 637 F. Supp. 2d 856, 867 (D. Haw. 2009) ("This Court has previously analyzed the interaction between Rule 16 and LR 7.9, and held that a party may not circumvent the dispositive motions deadline by filing a counter-motion under LR 7.9.").

Turning to Defendant Lum's motion, he first argues that he is entitled to summary judgment on both the Fourth and Fourteenth Amendment claims asserted under 42 U.S.C. § 1983. Defendant Lum further argues that Plaintiff fails to establish that Defendant Lum possessed the requisite state of mind for a § 1983 constitutional violation.  Finally, Defendant Lum claims that even if his actions had violated Plaintiff's Fourth or Fourteenth Amendment rights, Defendant Lum is entitled to qualified immunity because such violations were not clearly established.

The Court will consider each constitutional claim in turn, first determining whether Defendant Lum has carried his burden on summary judgment on each claim, and then considering

whether the identified rights were clearly established for purposes of qualified immunity.  Because Defendant Lum fails to come forward with sufficient evidence on summary judgment, the Court DENIES his motion for summary judgment.

## III. Fourth Amendment Constitutional Violation

Plaintiff has alleged that Defendant Lum violated her Fourth Amendment rights by participating in the unreasonable seizure of Jasper.  On summary judgment, Defendant Lum argues that (1) Plaintiff has failed to establish a possessory interest in Jasper; and (2) that even if he had seized Jasper, Plaintiff has not established joint action.  The Court addresses each argument in turn.

### a. Possessory Interest

A Fourth Amendment property seizure "occurs when there is some meaningful interference with an individual's possessory interests in that property." Sodal v. Cook Cty., Ill., 506 U.S. 56, 61, 113 S. Ct. 538, 540, 121 L. Ed. 2d 450 (1992) (internal quotation marks and citations omitted).  A Fourth Amendment claim alleging the unreasonable seizure of property necessarily fails if the plaintiff lacks a possessory interest in that property.  See Brown v. United States, 411 U.S. 223, 229, 93 S. Ct. 1565, 1569, 36 L. Ed. 2d 208 (1973) (holding that individuals lack standing to contest a seizure of property if they lack a proprietary or possessory interest in that

property).  A possessory interest involves "the fact of having or holding property in one's power; the exercise of dominion over property."  United States v. JP Morgan Chase Bank Acct. No. Ending 8215 in Name of Ladislao v. Samaniego, VL: $446,377.36, 835 F.3d 1159, 1165-66 (9th Cir. 2016) (citing Black's Law Dictionary (10th ed. 2014)).

"Unlike an ownership interest, a possessory interest arises even if the claimant is merely 'holding the item for a friend' who has temporarily transferred control of the item to the claimant for safekeeping." Id. at 1166 (citing United States v. $191,910.00 in U.S. Currency, 16 F.3d 1051, 1058 (9th Cir. 1994), superseded by statute on other grounds as stated in United States v. $80,180.00 in U.S. Currency, 303 F.3d 1182, 1184 (9th Cir. 2002)).

Defendant Lum specifically argues that even if Plaintiff had a possessory interest in Jasper at some point, the possessory interest was terminated by Wolfram when she reclaimed him.  Mot. at 8.  Because Wolfram reclaimed Jasper at the end of the trial period, therefore-in Defendant Lum's view-any possessory interest Plaintiff had in the horse was terminated. Mot. at 11.

While the exact ownership rights to Jasper are clearly disputed by the parties, it is undeniable that Plaintiff had been in possession of Jasper for some thirty days with Wolfram's

agreement, past the disputed three-week trial period.  In their negotiations, Wolfram specifically told Plaintiff that "[Jasper] would be YOURS legally without a sale agreement."  Def. Ex. 2. Because there is disagreement over the terms of agreement and at the very least Plaintiff was in possession of Jasper on October 28, 2017, the Court is unable to find at this stage that Plaintiff had no possessory interest in Jasper at the time of the seizure.  See United States v. Uu, 293 F. Supp. 3d 1209, 1215 (D. Haw. 2017) ("But ultimately, even with a minimal possessory interest [], Uu retained some possessory interest in the backpack . . . .").

Wolfram and Defendant Lum argue that there was no wrongful seizure both because retaking Jasper was reasonably necessary for the safety and medical care of the horse, and because Defendant Lum simply stood by to keep the peace and expressed no opinion as to who was entitled to Jasper.

Moreover, Wolfram asserts that Dr. Himenes determined that Jasper should be transferred from the unsafe pen and that after Sakata stated to Plaintiff to give the horse back and Dr. Himenes told Wolfram to walk Jasper, and observing Plaintiff having unlocked the gate, as well as Plaintiff's earlier statements about returning Jasper to Wolfram because of their disputes, she believed that Plaintiff had consented to return Jasper to her.  See Wolfram Decl. ¶¶ 48, 50.  Furthermore,

17

Defendant Lum asserts that other than trying to control the heated argument between Plaintiff and Wolfram, he simply stood by and never expressed who was entitled to Jasper; and Plaintiff acknowledged that Defendant Lum did not order Jasper to be given to Wolfram.  See Lum Decl. ¶ 13; Def. Ex. 5 at 97:15-20.

Viewing the evidence in the light most favorable to Plaintiff, there are material issues of fact which preclude summary judgment.

### b. Joint Action

Defendant Lum next argues that Plaintiff fails to establish an unreasonable seizure claim predicated upon joint action between Wolfram and himself.  Mot. at 11.  Both of the Court's prior orders found that Plaintiff had sufficiently alleged joint action.  At the summary judgment stage, the Court finds that Plaintiff has brought forth evidence sufficient to raise an issue of material fact.

"A plaintiff may demonstrate joint action by proving the existence of a conspiracy or by showing that the private party was 'a willful participant in joint action with the State or its agents.'"  Franklin v. Fox, 312 F.3d 423, 445 (9th Cir. 2002) (quoting Collins v. Womancare, 878 F.2d 1145, 1154 (9th Cir. 1989)).  "Our cases have been careful to require a substantial degree of cooperation before imposing civil liability for actions by private individuals that impinge on

18

civil rights," id., only finding liability where "the particular actions challenged are inextricably intertwined with those of the government," Mathis v. Pac. Gas & Elec. Co., 75 F.3d 498, 503 (9th Cir. 1996).

"At some point, as police involvement becomes increasingly important, repossession by private individuals assumes the character of state action." Howerton v. Gabica, 708 F.2d 380, 383 (9th Cir. 1983). The court in Howerton found that landlords seeking to evict tenants acted under color of law by virtue of extensive cooperation with a police officer. While "[a] single request for the police to perform their peace-keeping functions may not be sufficient to make a landlord a 'joint actor' with the state for section 1983 purposes," the landlords in that case requested and obtained police intervention at every step of the eviction. Id. at 384-85. The court noted that the police officer became so involved as to make an unsolicited visit to the tenants recommending that they leave, and to separately inquire whether the tenants had found a new residence. Id. at 384.

Here, Defendant Lum argues that he had only "limited participation" in the repossession. Mot. at 13. By October 28, 2017, negotiations between the parties had fallen through, Plaintiff had consulted an attorney, and Wolfram had been headbutted and threatened by Sakata the day before. Therefore,

according to Wolfram, she sought police assistance only to bear witness and to keep the peace.  Wolfram Decl. ¶ 39.  But it is clear that Wolfram personally contacted Defendant Lum and discussed her desire to retrieve Jasper prior to Defendant Lum's provision of stand-by assistance.  See Pl. Ex A.

At the Waimanolo Polo Fields, Defendant Lum did more than stand-by; at the very least he intervened and questioned Plaintiff's claim of ownership.  Lum Decl. ¶ 10.  Defendant Lum contends he was simply trying to keep the peace.  Id. ¶¶ 8, 9.  According to Plaintiff, Defendant Lum also "determined that Defendant Wolfram owned 'Jasper' and would be released to her."  Pl. CSF ¶ 26.  In his written report, Defendant Lum reported that he had "determined that the horse would be released to Wolfram . . . ."  Pl. Ex. A.  Plaintiff felt she "no longer [] had a choice" because she was "afraid of Defendant Lum."[2] Hollandsworth Decl. ¶ 31.  Defendant Lum contends he never expressed to anyone at the site who he thought was entitled to Jasper.  See Lum Decl. ¶ 13.  As discussed earlier, Wolfram

---

[2] Plaintiff also asserts in her declaration that Defendant Lum was "yelling and cussing at [her and Sakata], kept ordering us to be quiet, shut up, and listen to him, and threatened to arrest us if we did not."  Hollandsworth Decl. ¶ 26.  Plaintiff did not include this alleged threat of arrest in her complaint, and she contradicted her sworn testimony in her deposition.  See Def. Ex. 5 at 152: 14-19 ("Q: Did Officer Lum threaten to arrest you if you did not give back the horse?  A: I don't recall him saying exactly that, but . . . I don't remember.  Q: You don't recall him saying that?  A: No.").  The Court therefore will not consider Plaintiff's alleged threat of arrest in its analysis.  See Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir. 1991); Yeager v. Bowlin, No. CIV. 2:08-102 WBS JFM, 2010 WL 95242, at *3 (E. D. Cal. Jan. 6, 2010).

stated it was Sakata's statement to Plaintiff to give back
Jasper, together with Dr. Himenes determining Jasper needed to
be moved from the pen for safety and medical treatment reasons,
and observing Plaintiff having unlocked the gate, as well as
Plaintiff's earlier statements about returning Jasper to Wolfram
because of their disputes, that led Wolfram to believe that
Plaintiff had consented to returning Jasper to her.  See Wolfram
Decl. ¶ 50.

Taken in the light most favorable to Plaintiff, these
facts create issues of material fact on the question of joint
action.

## IV.  Fourteenth Amendment Constitutional Violation

Defendant Lum also moves for summary judgment on
Plaintiff's Fourteenth Amendment claim.  Plaintiff asserts that
Defendant Lum violated her Fourteenth Amendment rights by
depriving her of property without due process of law.  Compl. ¶
59.  As repeated in the Court's Prior Lum Order, a procedural
due process claim has two distinct elements: "(1) a deprivation
of a constitutionally protected liberty or property interest,
and (2) a denial of adequate procedural protections."  Brewster
v. Bd. of Educ. of Lynwood Unified Sch. Dist., 149 F.3d 971, 982
(9th Cir. 1998).  When a plaintiff's § 1983 claim is based on a
repossession, the Fourth and Fourteenth Amendment inquiries are

the same.  See Meyers v. Redwood City, 400 F.3d 765, 770-771 (9th Cir. 2005).

On summary judgment, Defendant Lum argues that (1) Plaintiff has failed to establish a possessory interest in the horse; and (2) Plaintiff has not established a joint action theory of liability.  The Court has already found that there are material issues of fact regarding whether Plaintiff has established either a possessory interest or joint action.

## V.   Requisite State of Mind for a § 1983 Violation

Next, Defendant Lum argues that Plaintiff fails to establish that Lum acted with the reckless disregard or deliberate indifference necessary for a § 1983 claim.  Mot. at 24-25.

Section 1983 "contains no state-of-mind requirement independent of that necessary to state a violation of the underlying constitutional right."  Tennison v. City and Cty. of San Francisco, 570 F.3d 1078, 1088 (9th Cir. 2009) (internal citation and quotation omitted).  However, "in any given § 1983 suit, the plaintiff must still prove a violation of the underlying constitutional right; and depending on the right, merely negligent conduct may not be enough to state a claim." Daniels v. Williams, 474 U.S. 327, 330, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986).  The Ninth Circuit has reiterated that "a § 1983 plaintiff must show that police officers acted with

deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors." Tennison, 570 F.3d at 1088; see also Wood v. Ostrander, 879 F.2d 583, 588 & n.4 (9th Cir. 1989) (applying a "deliberate indifference" standard to violations of personal security).

Under the Fourth Amendment, an action is "reasonable," regardless of the individual officer's state of mind, "as long as the circumstances, viewed objectively, justify [the] action." Brigham City, Utah v. Stuart, 547 U.S. 398, 404, 126 S. Ct. 1943, 1948, 164 L. Ed. 2d 650 (2006) (internal citation and quotation omitted).  The officer's subjective motivation is irrelevant.  See Bond v. United States, 529 U.S. 334, 338, n.2, 120 S. Ct. 1462, 146 L. Ed. 2d 365 (2000) ("The parties properly agree that the subjective intent of the law enforcement officer is irrelevant in determining whether that officer's actions violate the Fourth Amendment . . . the issue is not his state of mind, but the objective effect of his actions"); Graham v. Connor, 490 U.S. 386, 397, 109 S. Ct. 1865, 1872-73, 104 L. Ed. 2d 443 (1989) ("[O]ur prior cases make clear" that "the subjective motivations of the individual officers . . . ha[ve] no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment.").  Violation of the Fourth Amendment also requires "an intentional acquisition of physical

23

control," meaning that "the detention or taking itself must be willful." Hyun Ju Park v. City and Cty. of Honolulu, 292 F. Supp. 3d 1080, 1093 (D. Haw. 2018) (quoting Brower v. Cty. of Inyo, 489 U.S. 593, 596-97, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989)).  Defendant Lum does not appear to dispute that the seizure of Jasper was willful; however, Defendant Lum denies he participated in any seizure.  Defendant Lum also asserts that he did not express who he felt was entitled to Jasper.  See Lum Decl. ¶ 13.

The analysis under the Fourteenth Amendment is different.  The "touchstone of due process is protection of the individual against arbitrary action of government," Wolff v. McDonnell, 418 U.S. 539, 558, 94 S. Ct. 2963, 2976, 41 L. Ed. 2d 935 (1974), and "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." Cty. of Sacramento v. Lewis, 523 U.S. 833, 846, 118 S. Ct. 1708, 1716, 140 L. Ed. 2d 1043 (1998) (internal citation and quotation marks omitted).  The Supreme Court has held that official conduct rises to this level only if it "shocks the conscience." Id. The standard used to assess whether conduct shocks the conscience depends on "whether the officers had the opportunity for actual deliberation." Porter v. Osborn, 546 F.3d 1131, 1138 (9th Cir. 2008).  "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the

conscience." Wilkinson v. Torres, 610 F.3d 546, 554 (9th Cir. 2010).

On the other hand, "where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." Id. Legitimate law enforcement objectives include, among others, "arrest, self-protection, and protection of the public." Foster v. City of Indio, 908 F.3d 1204, 1211 (9th Cir. 2018). Conversely, an officer "lacks such legitimate law enforcement objectives when the officer had any ulterior motives for using force against the suspect . . . such as to bully a suspect or get even . . . or when an officer uses force against a clearly harmless or subdued suspect." Id. (internal citation and quotation marks omitted).

The deliberate indifference inquiry "should go to the jury if any rational factfinder could find this requisite mental state." Patel v. Kent Sch. Dist., 648 F.3d 965, 974 (9th Cir. 2011) (citing Wood, 879 F.2d at 588 n.4). Here, there are questions as to whether Wolfram first gave Defendant Lum her side of the story before he arrived on the scene, and whether or how such information impacted his state of mind. While Defendant Lum had time to converse with Wolfram when they arrived at the Waimanolo Polo Fields, when Plaintiff and Sakata

25

arrived there was a heated argument as to who was entitled to Jasper.  Because there are material issues of fact as to whether Defendant Lum was deliberately indifferent, the Court DENIES summary judgment on both constitutional claims.

## VI.  Qualified Immunity

As stated in the Court's Prior Lum Order, qualified immunity protects government officials who perform discretionary functions from liability for civil damages when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).  "To determine whether an individual officer is entitled to qualified immunity, we ask (1) whether the official violated a constitutional right and (2) whether the constitutional right was clearly established."  C.B. v. City of Sonora, 769 F.3d 1005, 1022 (9th Cir. 2014) (citing Pearson, 555 U.S. at 232, 236).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" Mullenix v. Luna, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015) (quoting Reichle v. Howards, 566 U.S. 658, 664, 132 S. Ct. 2088, 2093, 182 L. Ed. 2d 985 (2012)).  In conducting this analysis,

courts are "not to define clearly established law at a high level of generality," and should instead focus on "whether the violative nature of particular conduct is clearly established." Ashcroft, 563 U.S. at 742.  The Supreme Court has recently stated:

> We have repeatedly told courts not to define clearly established law at too high a level of generality.  See, e.g., Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011).  It is not enough that a rule be suggested by then-existing precedent; the "rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Wesby, 583 U.S., at [] 14 [] (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)).  Such specificity is "especially important in the Fourth Amendment context," where it is "sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." Mullenix v. Luna, 577 U.S. 7, 12 (2015) (per curiam) (internal quotation marks omitted).

City of Tahlequah, Oklahoma v. Bond, No. 20-1668, 2021 WL 4822664, at *3 (U.S. Oct. 18, 2021); see also Rivas-Villegas v. Cortesluna, No. 20-1539, 2021 WL 4822662, at *3 (U.S. Oct. 18, 2021). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" Mullenix, 136 S. Ct. at 308 (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)).

### a. Fourth Amendment

The Supreme Court has held that police officers who provide stand-by assistance during a private repossession and substantially intervene in that private repossession may be

27

liable for violating an individual's Fourth Amendment right to be free from unreasonable seizures.  Soldal, 506 U.S. at 56.

In Soldal, the Supreme Court expressly rejected the contention that the stated violation "was more akin" to a due process challenge than a Fourth Amendment challenge.  Id. at 69-70.  It explained that there is "no basis for doling out constitutional protections in such fashion" because where "wrongs affect more than a single right" those wrongs "can implicate more than one of the Constitution's commands."  Id. at 70.  Thus, under Soldal, it was clearly established that police officers improperly assisting an individual in a property dispute can simultaneously offend Fourth and Fourteenth Amendment protections.  Therefore, conducting a seizure without providing an individual her clearly established right to procedural due process would make the seizure unreasonable.  See Fuentes v. Shevin, 407 U.S. 67, 80, 92 S. Ct. 1983, 1994, 32 L. Ed. 2d 556 (1972); Harris v. City of Roseburg, 664 F.2d 1121, 1127 (9th Cir. 1981); Russell v. City and Cty. of Honolulu, No. CIV. 13-00475 LEK, 2013 WL 6222714, at *15 (D. Haw. Nov. 29, 2013).

Defendant Lum asserts that the facts of this case are distinguishable from those referenced; and cites Meyers v. Redwood City, 400 F.3d 765 (9th Cir. 2005), in which the Ninth Circuit found that "[e]ven with a copy of Harris in their back

pockets, the officers could not have determined at what point in the middle of this messy repossession they deprived Meyers of her property without due process of law." Id. at 774.

However, ultimately, as discussed infra, it will be for the Court to determine whether the law is clearly established or whether Defendant Lum is entitled to qualified immunity, based on the facts of this case as determined by the jury.

This Court considered on an earlier motion to dismiss whether Plaintiff's claims were sufficiently pleaded to withstand the motion; and now the Court must consider on a motion for summary judgment whether Defendant Lum provided sufficient evidence in support of those claims with no remaining issues of material fact. The Court previously answered that question by finding that it was clearly established that a police officer could not legally use his authority as a police officer to deprive an individual of her property without the provision of due process.

Now at the summary judgment stage, Defendant Lum and Wolfram have presented evidence as discussed supra and in their declarations which they assert present facts that distinguish Soldal and the other cases cited supra, such that there is no clearly stablished law; namely, that Dr. Himenes determined there was a reasonable need to remove Jasper from the dangerous

pen for safety and medical treatment and that following Sakata's statement to Plaintiff to "just give her back the horse," and observing Plaintiff had unlocked the gate, as well as Plaintiff's earlier statements about Plaintiff returning Jasper to Wolfram because of their disputes, all led Wolfram to believe Plaintiff had consented to Wolfram retaking the horse and Defendant Lum simply stood by to keep the peace.  On the other hand, Plaintiff asserts that the evidence she has presented as discussed <u>supra</u> and in her declaration establish that Defendant Lum is not entitled to qualified immunity.

The Ninth Circuit has explained that its Model Civil Jury Instructions make clear that "[w]hen there are disputed factual issues that are necessary to a qualified immunity decision, these issues must first be determined by the jury before the court can rule on qualified immunity.  The issue can then be raised in a [Federal Rule of Civil Procedure] Rule 50(a) motion at the close of evidence" for the court to make a legal determination whether there was a violation of clearly established law.  <u>Morales v. Fry</u>, 873 F.3d 817, 824 (9th Cir. 2017) (citing <u>Tortu v. Las Vegas Metro. Police Dep't</u>, 556 F.3d 1075, 1083 (9th Cir. 2009)); <u>see also</u> Ninth Circuit Model Civil Jury Instruction 9.34 (2020) (noting that "qualified immunity is a question of law, not a question of fact."); <u>Littrell v. Franklin</u>, 388 F.3d 578, 584 (8th Cir. 2004).

Thus, there are material issues of fact for the jury to determine whether to believe the evidence presented by Defendant Lum and Wolfram, or whether to believe the evidence presented by Plaintiff; and then pursuant to a Federal Rule of Civil Procedure Rule 50(a) motion the Court will need to determine whether there is clearly established law or whether Defendant Lum is entitled to qualified immunity.

Accordingly, the Court finds that there are material issues of fact which preclude granting summary judgment on the basis of qualified immunity on Plaintiff's Fourth Amendment claim.

**b. Fourteenth Amendment**

As stated in the Court's Prior Lum Order, a procedural due process claim has two distinct elements: "(1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." Brewster, 149 F.3d at 982.  In order to determine whether the provided procedural protections are adequate, courts weigh the three factors announced in Mathews v. Eldridge:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the

31

> additional or substitute procedural requirement
> would entail.

424 U.S. 319, 335, 96 S. Ct. 893, 903, 47 L. Ed. 2d 18 (1976).

Although application of these factors generally "requires some kind of a hearing before the State deprives a person of liberty or property," Zinermon v. Burch, 494 U.S. 113, 127, 110 S. Ct. 975, 984, 108 L. Ed. 2d 100 (1990) (citations omitted), application of the Mathews factors creates "numerous exceptions to this general rule." Clement v. City of Glendale, 518 F.3d 1090, 1093-94 (9th Cir. 2008). For example, a pre-deprivation notice and hearing may not be required in an emergency, or when notice would defeat the purpose of a seizure. Id. (citing Zinermon, 494 U.S. at 132 and Mathews, 424 U.S. at 335).

Relevant here, the Supreme Court has announced an exception in circumstances where a state officer acts in a "random and unauthorized" manner. Zinermon, 494 U.S. at 127. That exception is derived from two cases. In Parratt v. Taylor, 451 U.S. 527, 534, 101 S. Ct. 1908, 1912, 68 L. Ed. 2d 420 (1981), overruled in part on other grounds by Daniels v. Williams, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986), prison officers negligently lost a prisoner's mail. In Hudson v. Palmer, 468 U.S. 517, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984), a prison officer, acting on an apparent personal

32

vendetta, maliciously destroyed a prisoner's property.  In each case, the State could not have foreseen the specific deprivation and "no predeprivation safeguards would be of use in preventing the kind of deprivation alleged."  Zinermon, 494 U.S. at 139 (discussing Hudson and Parratt).  Accordingly, under the so-called Parratt-Hudson doctrine, "postdeprivation tort remedies are all the process that is due, simply because they are the only remedies the State could be expected to provide."  Id. at 128.

The Supreme Court went on to hold that the Parratt-Hudson doctrine did not apply in Zinermon itself.  The actions of the officers in that case could not be properly deemed "random and unauthorized" because (1) any erroneous deprivation would occur at a predictable time, and thus was foreseeable; (2) the creation of a pre-deprivation process could have averted the deprivation; and (3) the officials had acted pursuant to broad "power and authority to effect the very deprivation complained of" and their actions thus were not unauthorized.  Id. at 136-38.  Accordingly, the Zinermon plaintiff had sufficiently stated a claim for a violation of his procedural due process rights irrespective of the availability of post-deprivation tort remedies.  Id. at 139.

This Court's Prior Lum Order found that Plaintiff's allegations regarding her Fourteenth Amendment claim were

sufficiently plausible to withstand Defendant Lum's motion to dismiss based on qualified immunity because the law is clearly established.  Prior Lum Order at 21.  In making the finding, the Court emphasized the default rule that notice and an opportunity to be heard should be provided prior to the state assisting in depriving a person of property, and that precedent makes clear that the default rule applies to police providing stand-by assistance during a private repossession.  Id. at 20-21.

Similar to its analysis regarding qualified immunity with regard to Plaintiff's Fourth Amendment claim, the Court reiterates that because there are disputed material issues of fact necessary to a qualified immunity decision, these issues must first be determined by the jury before the Court can rule on whether the law is clearly established or whether Defendant Lum is entitled to qualified immunity.

The Court therefore DENIES Defendant Lum's motion on the basis of qualified immunity on Plaintiff's Fourteenth Amendment claim because there are material issues of fact.

## CONCLUSION

For the reasons discussed above, the Court DENIES Defendant Lum's motion for summary judgment, ECF No. 51.

IT IS SO ORDERED.

DATED:  Honolulu, Hawai`i, October 22, 2021.



_____
Alan C. Kay
Sr. United States District Judge

Hollandsworth v. City and County of Honolulu, et al., Civ. No. 19-00587 ACK-WRP, Order Denying Defendant Lum's Motion for Summary Judgment (ECF No. 51).